# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES POLICE PROTECTIVE LEAGUE, | Case No. CV 08-0784 GAF (RCx) |
| Plaintiff, | |
| vs. | MEMORANDUM & ORDER REGARDING CITY'S MOTION FOR SUMMARY JUDGMENT |
| CITY OF LOS ANGELES, et al., | |
| Defendants. | |

## I.

## INTRODUCTION

In United States v. City of Los Angeles, CV 00-11769, a lawsuit brought by the U.S. Department of Justice against the City of Los Angeles under 42 U.S.C. § 14141, the parties negotiated a lengthy Consent Decree mandating numerous reforms of the Los Angeles Police Department ("LAPD"). The Consent Decree sought to address numerous forms of potential misconduct and corruption within the LAPD, and it included a term – Paragraph 132 – that mandated the disclosure of detailed financial information "by all LAPD officers and other LAPD employees who routinely handle valuable contraband or cash." The directives of Paragraph 132 have since been subject to challenge by the police union, the Los Angeles Police Protective League ("LAPPL"). The LAPPL argues that financial disclosures in the Special Order violate its members' privacy rights under California law.

In recent years, the LAPPL and the City of Los Angeles (the "City") met and conferred but could not negotiate an agreement on the implementation of Paragraph 132 that was acceptable to the Court. Thereafter, the LAPD unilaterally crafted, and the Police Commission and City Council approved, a comprehensive financial disclosure obligation memorialized in a Confidential Special Order on Financial Disclosure ("Special Order"). The LAPPL then filed the present suit to enjoin implementation of the Special Order or "any other financial disclosure requirements that violate the privacy rights of League represented employees . . . ." The suit states several causes of action, including claims that Paragraph 132: (1) violates LAPD Officers' right of privacy under the California Constitution; (2) violates LAPD Officers' rights under separate portions of the Peace Officer's Bill of Rights ("POBR"); (3) breaches a collective bargaining memorandum of understanding between the City and the LAPPL; and (4) impairs contractual obligations, in violation of the California Constitution's contracts clause.

## II.

## PROCEDURAL HISTORY

The present lawsuit was originally filed in Los Angeles County Superior Court and was removed to this Court by the City on the ground that the lawsuit presented a federal question. The LAPPL moved to remand. The LAPPL argued that, even though the case involved actions taken pursuant to a federal consent decree, its complaint presented only state law claims and therefore should not be heard in federal court. The Court received extensive briefing on the issue of its subject matter jurisdiction, and ultimately concluded that "a federal cause of action is not an essential condition to the exercise of federal-question jurisdiction." Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308, 311-12 (2005). The Court therefore denied the motion to remand.

In the meantime, the LAPPL moved for a preliminary injunction to preclude the City from implementing the Special Order. After extensive briefing and argument on

that issue, the Court concluded that the LAPPL had not raised serious questions going to the merits of its privacy and related claims and that it had "not persuaded the Court that implementation of the Proposed Special Order threatens immediate and irreparable harm to its members . . . ." The Court further concluded that the requested injunction would not be in the public interest.

Thereafter, the LAPPL appealed to the Ninth Circuit claiming that the Court erred in assuming jurisdiction over the case and in denying its application for preliminary injunction. It also appealed Judge Wilson's denial of the LAPPL's motion to recuse this Court from considering the case. The Ninth Circuit rejected the appeal in its entirety and affirmed this Court's decisions on February 26, 2009. See Los Angeles Police Protective League v. City of Los Angeles (LAPPL), 314 F. App'x 72 (9th Cir. 2009). The City now moves for summary judgment as to all of the LAPPL's claims.

### III.

### BACKGROUND

The present lawsuit arises out of this Court's efforts to enforce a federal Consent Decree negotiated by the City and the Department of Justice and signed by this Court.

### A.  THE 2001 DEPARTMENT OF JUSTICE LAWSUIT

After a lengthy period of negotiation, the United States Department of Justice brought suit against the City under 42 U.S.C. § 14141 "to remedy a pattern or practice of conduct by law enforcement officers of the Los Angeles Police Department that deprives persons of rights, privileges, and immunities secured or protected by the Constitution or laws of the United States." (Department of Justice ("DOJ") Complaint ¶ 1.) The DOJ Complaint alleged that the LAPD suffered from "systemic deficiencies" that included:

> b.  failing to train LAPD officers adequately to prevent the occurrence of misconduct;

3

c. failing to supervise LAPD officers adequately to prevent the occurrence of misconduct;

d. failing to monitor adequately LAPD officers who engage in or may be likely to engage in misconduct . . .

(DOJ Complaint ¶ 11.) Thus, the complaint spoke in the broadest possible terms regarding the department's failure to operate within the law and cited failures in training, supervision and oversight as critical factors leading to the lawlessness and misconduct of too many officers.

**B. THE CONSENT DECREE**

The suit was settled through the Consent Decree that provides the backdrop to this lawsuit. The decree was the product of extensive negotiations between the City, including its police chief, and the Department of Justice, and was submitted to the Court for its approval. The Court held hearings on the document and ultimately signed the judgment as presented by the parties. The Consent Decree, a 90 page document, contains numerous terms and conditions, including a Section B entitled "Audits by the LAPD" that contains Paragraph 132, the provision at issue in the pending litigation. Paragraph 132 provides:

The LAPD shall require regular and periodic financial disclosure by all LAPD officers and other LAPD employees who routinely handle valuable contraband or cash. The LAPD shall periodically audit a random sample of such disclosures to ensure their accuracy. When necessary, the LAPD shall require the necessary waivers from such officers.

This financial disclosure provision recognizes the potential for corruption and misconduct by those handling what are, at times, very large sums of seized property and cash and was undoubtedly a response, at least in part, to the evidence of property thefts revealed as the Rampart scandal unfolded. The City acknowledged as much in proceedings on March 21, 2006, when its counsel indicated that Paragraph 132 was an

1  anti-corruption provision to deter and detect activities like those of disgraced officer

2  Rafael Perez. The disclosures also give the LAPD one means, among others, for

3  identifying income from unapproved moonlighting activities that create the potential for

4  conflicts of interest and in other ways undermine effective officer supervision and

5  oversight.

6  **C. IMPLEMENTATION OF PARAGRAPH 132**

7       The Court signed the Consent Decree in June 2001. Five years later the

8  financial disclosure provision had not been implemented due to LAPPL resistance.

9  Then, in early 2006, after almost five years of negotiation, the parties presented the

10  Court not with a financial disclosure agreement but with a proposed modification of

11  Paragraph 132 that would have substantially narrowed its scope in purported exchange

12  for an alternative means of detecting corruption. The parties jointly moved the Court to

13  approve the change.

14       The Court conducted a hearing on the motion. When the Court expressed

15  reservations regarding the proposed modification, the Department of Justice, though

16  capitulating to the requested modification, acknowledged that the revised Paragraph 132

17  was not what was envisioned when the Consent Decree was negotiated. The monitor

18  informed the Court that Paragraph 132 was designed to detect wrong-doing, to detect

19  potential conflicts of interest, to detect officers and employees who were in financial

20  difficulty and therefore at risk, and to serve as a deterrent to those in the affected units.

21  The monitor advised that the paragraph as originally drafted represents the "best

22  practice" in the field and that the proposed modification to Paragraph 132 would

23  undermine these objectives by, among other things, narrowing the class of officers

24  affected by the disclosure requirements. Having heard argument from all of those

25  involved in the proposed modification, the Court concluded that the modification

26  represented a significant narrowing of the decree essentially in exchange for nothing,

27  since the sting audits described in the revised Paragraph 132 were tools already

28

available to management through other provisions of the decree.  The Court denied the motion to modify Paragraph 132.

The parties then conducted further negotiations but could not reach agreement. Accordingly, the City drafted a Proposed Special Order setting forth a disclosure policy to be implemented by the LAPD to comply with the terms of the Consent Decree.  After the LAPPL was unsuccessful in its efforts, before this Court and the Ninth Circuit, to enjoin enforcement of the Proposed Special Order, the LAPD began implementing the Special Order's terms in March 2009; to date, the LAPD has reviewed approximately 30 financial disclosure forms.  (City's Response & Objections to Plaintiff's Separate Statement of Genuine Issues of Material Fact ("SGI") Nos. 31-32.)

**D.  THE SPECIAL ORDER**

It is undisputed that the Special Order applies to individuals who have been selected for an assignment to the following Units and Details:  Gang Impact Team (GIT), Gang Enforcement Detail (GED), Community Law Enforcement and Recovery (CLEAR) Unit, Narcotics Division (ND), and Narcotics Enforcement Detail (NED). (Special Order at 2-3, attached to the City's Notice of Lodging Exhibits, Docket No. 111, ("NOL") at Ex. 1; SGI No. 41.)  Additionally, it is undisputed that incumbents in these units and details are subject to comply with the Special Order by March 2011, two years after its initial implementation. (see SGI Nos. 31, 41, 42; Declaration of Gerald Chaleff ¶¶ 6, 8.)

Pursuant to the Special Order, the affected employees are required to fill out a Financial Disclosure Report listing the employees' "assets, including but not limited to properties, bank accounts, stocks, bonds and mutual funds; liabilities and outside income information."  (Chaleff Decl. ¶¶ 9-10; SGI No. 49; NOL, Ex. 1 (Special Order) at 14-15.)  The "financial disclosure form and accompanying documents do not require the inclusion of specific account numbers."  (SGI No. 50; see also Special Order, NOL at Ex. 1.) ("Account numbers are not required.  A general description is sufficient.")

On review of an employee's report, the employee is required to bring a credit report and documents that support the information provided on the report. (SGI No. 53.) However, the Police Department "will not make copies of any such supporting documentation, nor will it maintain originals of such documents." (SGI No. 56.) The Consent Decree Bureau will review the supporting documents and initial the corresponding box on the forms to verify that the documentation was provided and reviewed. (SGI No. 54.) If the Department requires a credit report, it will reimburse the officer, and the officer will retain the physical report. (SGI Nos. 58, 60.) Notations made during any interview with the officer regarding the disclosures are documented on a "Supporting Documentation" page. (SGI No. 55.)

The original Financial Disclosure Report and any "Supporting Documentation" or "Continuation Pages" are ultimately scanned to a disk, which is stored in a secured and locked location at the Office of the Chief of Police ("OCOP") and the employee retains the physical documents. (SGI No. 62.) All "forms" collected on the disk are to be "considered confidential and shall remain on file at the OCOP during the course of the employee's assignment." (SGI No. 66.)

## IV.

## DISCUSSION

### A. APPLICABLE LAW

#### 1. SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Thus, when addressing a motion for summary judgment, this Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely

by pointing out that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 250. The "opponent must do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### 2. LAW OF THE CASE

The Ninth Circuit has established the "general rule" that its "decisions at the preliminary injunction phase do not constitute the law of the case." Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric., 499 F.3d 1108, 1114 (9th Cir. 2007) (citing S. Or. Barter Fair v. Jackson County, 372 F.3d 1128, 1136 (9th Cir. 2008)) (internal quotation marks omitted). However, the Circuit's "conclusions on pure issues of law" are "binding." Ranchers, 499 F.3d at 1114. Thus, a "fully considered appellate ruling on an issue of law made on a preliminary injunction appeal...become[s] the law of the case for further proceedings in the trial court on remand and in any subsequent appeal." Ranchers, 499 F.3d at 1114 (citing 18 WRIGHT & MILLER, FED. PRACTICE & PROCEDURE § 4478.5 (2002)).

Accordingly, the City first argues that when the Ninth Circuit decided the appeal of this Court's preliminary injunction denial, it made "conclusions of law...[which] are binding" in determining the present motion for summary judgment. (Mot. at 10.) As a result, the City claims, this Court is bound to apply, as law of the case, the Circuit's statements that: (1) "the officers do not have a reasonable expectation of privacy in financial information they are required to disclose"; (2) there are legitimate competing interests that justify any potential invasion of privacy; and (3) "the Special Order comes within the purview of the statutory exceptions" to violations of the Police Officer's Bill of Rights, Government Code § 3308. LAPPL, 314 F. App'x. 72, 75 (9th Cir. 2009); see also Mot. at 9-10.

8

1   The League opposes by arguing that "the Court of Appeal reached its

2   conclusions based on the evidentiary record then introduced and whether the District

3   Court had abused its discretion in denying the preliminary injunction." (Opp. at 4.)  The

4   League also states that the law-of-the-case doctrine would not apply where there is

5   substantially different evidence "adduced at a subsequent trial," Jeffries v. Wood, 114

6   F.3d 1484, 1489 (9th Cir. 1997), and claims that it has "substantially augmented" the

7   record for summary judgment purposes.[1] (Opp. at 4.)

8   ### a. Circuit "Law of the Case" Regarding the LAPPL's Privacy Claim

9   The Court concludes that the Circuit's broad statements regarding the LAPPL's

10  constitutional privacy claim could properly be considered "law of the case" for present

11  purposes; thus, the Circuit's determination that "the officers do not have a reasonable

12  expectation of privacy" and therefore cannot prevail on their constitutional privacy

13  claim would control.  Nonetheless, the Circuit's opinion also included the statement that

14  the "scope of [its] review is generally limited to whether the district court employed the

15  proper preliminary injunction standard" and that in this particular case "the District

16  Court did not abuse its discretion." LAPPL, 314 F. App'x at 75.   There is no doubt that

17  the scope of review on an appeal from a denial of an application for preliminary

18  injunction focuses on the preliminary injunction standard.  At the same time, application

19  of that standard may involve the resolution of legal questions by the reviewing court.

20  Here, the circuit concluded, in its review of this Court's rulings, that the Court properly

21  applied the injunction standard because, among other things, the officers had no

22  reasonable expectation of privacy in the financial data at issue.  For that reason, the

23  Circuit's holding alone supports the entry of summary judgment in favor of the City on

24  the privacy claim.  However, because there is some ambiguity in the opinion, the Court

---

26  [1]At that juncture, the LAPPL misleadingly claims that "the Court of Appeal[s] found that the Special

27  Order only impacts a small number of officers"and "the Defendant now concedes that the Special Order will impact approximately 902 Department employees." (Opp. at 4.)  In fact, during the preliminary injunction stage and at the Court of Appeals, the Special Order affected 902 officers (see 8/21/08 Order

28  at 20 n.6); the same number of employees affected now. (Opp. at 4.)

9

assumes for purposes of discussion that the Circuit's earlier ruling does not constitute law of the case on this issue.

### b. Circuit "Law of the Case" Regarding the LAPPL's Government Code section 3308 Claim

#### i. The Circuit's Findings

On the other hand, the Circuit's analysis of the LAPPL's Government Code section 3308 claim clearly constitutes "law of the case." The Police Officers' Bill of Rights, Government Code section 3308, provides that:

> No public safety officer shall be required...for purposes of job assignment or other personnel action to disclose any item of his property, income, assets, source of income, debts or personal or domestic expenditures (including those of any member of his family or household) unless such information is obtained or required under state law or proper legal procedure, tends to indicate a conflict of interest with respect to the performance of his official duties, or is necessary for the employing agency to ascertain the desirability of assigning the public safety officer to a specialized unit in which there is a strong possibility that bribes or other improper inducements may be offered.

CAL. GOV'T CODE § 3308.

In considering the section 3308 claim, the Circuit specifically found that the "Special Order comes within the purview of the statutory exceptions" to liability under Government Code § 3308. LAPPL, 314 F. App'x at 75. First, the Circuit stated that "the Consent Decree is a federal court order," and therefore, "the Consent Decree, and...the Special Order are 'proper legal procedure[s]'" within the meaning of section 3308. Id. Second, the Circuit stated that "disclosure of financial information will assist the City in determining the impartiality of officers assigned to sensitive departments"; thus, the disclosures will help prevent "conflict[s] of interest with respect to the performance of...official duties," and are proper under section 3308. Id. Third, the Circuit determined that because "the officers subject to Paragraph 132...are 'handling valuable

10

contraband or cash, the disclosures are necessary'" to assess whether it is desirable to assign a particular officer to a unit where bribes or other inducements may be offered. See id.; see also CAL. GOV'T CODE § 3308.

While the Circuit supplemented its discussions of the "Privacy Claim" and "Irreparable Harm" issues with additional abuse-of-discretion analysis, the Circuit did not make such an addition when analyzing the § 3308 claim. LAPPL, 314 F. App'x at 75. Thus, because of the Circuit's clear finding that "the Special Order comes within the purview of the statutory exceptions," and its exclusion of abuse of discretion analysis, the Court concludes that the Circuit was making "conclusions of pure issues of law," which are to be presently applied. Id.; see also Ranchers, 499 F.3d at 1114.

### ii. The Effect of Jeffries

Additionally, the LAPPL has not "adduced" any "substantially different evidence" in its present opposition, Jeffries, 114 F.3d at 1489, on the issue of whether the Special Order complies with Government Code § 3308. Thus, Jeffries does not suggest that the Court should refrain from applying "law of the case" here.

The LAPPL first argues that "the information sought under the Special Order is not pursuant to state law or proper legal procedure where: 1) the information sought in the Special Order was not required by state law; 2) the specific provisions of the Special Order were neither mandated by the Consent Decree nor formulated nor ordered by the Court; and 3)...there are no written, binding, and explicit safeguards." (Opp. at 13-14.) The LAPPL cites neither evidence nor authority to support these contentions, and it has not demonstrated any "substantially different evidence" that the Special Order was not issued pursuant to proper procedure. Jeffries, 114 F.3d at 1489. The Court's previous order already stated that the Proposed Special Order was "promulgated under Paragraph 132 of the Consent Decree." (8/21/08 Order at 24.) While the LAPPL previously did not "put forth the untenable argument that an order from a federal district court is not 'proper legal procedure,'" that argument is, for some reason, advanced to oppose the present motion. (Id.) The delay in the presentation of the argument has not

11

made it any more persuasive.

Next the LAPPL attempts to delineate new evidence by citing the Court's remark that certain "conflict of interest forms" discussed during the preliminary injunction proceedings "did not allow for detection of corruption" (See 8/21/08 Order, Docket No. 72, at 15.), implying that the Court's remark referred to the Special Order disclosure form in use today. (Opp. at 14.) Not so. The Court was instead referring to the proposed "conflict of interest form similar to certain public officials and judicial officers" which the LAPPL had suggested as an alternative and purportedly "less invasive" anti-corruption method. (8/21/08 Order at 15 n.3.) This Court's view regarding LAPPL's proposed alternative form cannot now be cited as evidence that the disclosure form utilized pursuant to the Special Order does not detect corruption.

Next, the LAPPL states that there is "no empirical evidence in the record that all officers assigned to the specified units in the Special Order are more susceptible to bribes or other improper inducements than other assignments in the LAPD." (Opp. at 14.) Other than being beside the point, this contention was in the record at the preliminary injunction stage of the proceedings, see 8/21/08 Order at 24, and does not constitute "substantially new evidence" that now forecloses applying the "law of the case." Jeffries, 114 F.3d at 1489. The LAPPL also states that "most drug arrests in the field of law enforcement are not made by specialized units. (SGI No. 129.) However, this statement is based on the opinion of expert Joseph McNamara, which is not supported by any specific factual findings.[2]    (SGI No. 129; Declaration of Joseph

---

[2]McNamara's declaration indicates that he reviewed "the Complaint for Declaratory Relief...and exhibits thereto...Special Order No. 20...Ruling by Federal District Court...decision by the 9th Circuit...Independent Monitor's Response...as well as various Declarations previously filed in this action." (McNamara Decl. ¶ 11.) McNamara then states in his expert report that "I focused my primary research [at the Hoover Institution] on police drug corruption, closely reviewing reported drug corruption throughout the nation...in the NYPD, the Los Angeles Sheriff's Department, and during the LAPD Ramparts Scandal....To summarize, I consistently found that in policing, most drug arrests are made by uniformed patrol officers and not specialized investigatory units." (Id., Ex. 1 at 20.) Yet he offers no citation to any of his own research or empirical studies that supports this finding. Nor does he articulate a persuasive reason why conduct involving routine street drug arrests, which typically involve small amounts of drugs and money teaches anything about the potential for corruption in specialized units.

McNamara ¶ 14; Id. Ex. 1 at 20.)  Additionally, McNamara's declaration does not constitute "substantially new evidence" because similar evidence—such as the contention that "disclosures will have no realistic value in deterring or detecting corruption"—was previously before the Court at the preliminary injunction stage.  (See Cooley Decl., Docket No. 40, ¶ 4.)

Finally, the LAPPL claims that "the Special Order is also applied to <u>incumbents</u> in the designated assignments"; thus, "the exception in Section 3308 as to ascertaining the 'desirability of assigning' would not have application to incumbents who have already been deemed desirable by the Police Department."  (Opp. at 14.)  This is merely an argument, with no citation to "substantially different evidence," <u>Jeffries</u>, 114 F.3d at 1489, to support it.  Furthermore, it is merely a semantic dodge to claim that the term "assigning" renders the statute inapplicable to incumbents.  As the Court concluded in its preliminary injunction order, this particular clause of the statute generally "relates to 'purposes of job assignment <u>or</u> other personnel action,'" and would be equally applicable to incumbents. (8/21/08 Order at 23.)

Because the Circuit's ruling as to Government Code section 8033 constitutes "law of the case," and there is no substantially different evidence "adduced" regarding this claim, the Court will apply the Circuit's decision as binding law on this particular issue.

With these considerations in mind, the Court now proceeds to consider the viability of the LAPPL's five claims.

**B. APPLICATION**

### 1. RIGHT OF PRIVACY CLAIM

Consistent with the analysis above, the Court will examine the LAPPL's right of privacy claim without referencing the Circuit "law of the case" that could reasonably

foreclose the entire claim. The Court therefore begins its analysis <u>not</u> with the decision above, but rather with the California Constitution.

Under Article I, Section 1 thereof:

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

CAL. CONST., art. 1, § 1 ("Section 1").

To state a claim for invasion of privacy in violation of Section 1, a party must show: 1) a legally protected privacy interest; 2) a reasonable expectation of privacy; and 3) a serious invasion of privacy. See <u>Hill v. Nat'l Collegiate Athletic Ass'n</u>, 7 Cal. 4th 1, 35-37 (1994).

Where a party has demonstrated a legally protected privacy interest and a reasonable expectation of privacy, it must still face the holding in <u>Hill</u> that "invasion of [that] interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial activities of government." <u>Id.</u> at 38. Thus, conduct "alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests," and the government or private parties may seek to defend a right of privacy claim by demonstrating such competing interests. <u>Id.</u>

Faced with such a "competing interest" defense, however, a plaintiff's cause does not simply wither on the vine; rather, the plaintiff "may undertake the burden of demonstrating the availability and use of protective measures, safeguards, and alternatives to defendant's [allegedly invasive] conduct that would minimize the intrusion on privacy interests." <u>Id.</u> (citations omitted). Thus, "if sensitive information is gathered and feasible safeguards are slipshod or nonexistent, or if defendant's legitimate objectives can be readily accomplished by alternative means having little or no impact

14

on privacy interests, the prospect of actionable invasion of privacy is enhanced," despite the presence of the competing government interest. Id. However, "if the intrusion is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged." Id.

This Court previously concluded that Hill "teaches that a trial court must consider the totality of the circumstances in considering whether a legitimate governmental interest in obtaining information outweighs an individual's right to privacy in that information," and that "no single factor should be viewed as determinative of a right to privacy claim." (8/21/08 Order at 14.) The parties do not provide further briefing suggesting that the Court's previous findings, and its consideration of Hill in relation to Hansen v. Cal. Dep't of Corrections, 920 F. Supp. 1480 (N.D. Cal. 1996), were incorrect.[3] With its previous conclusion in mind, the Court proceeds to consider the evidence and arguments as presently submitted.

### a. Legally Protected Privacy Interest

As discussed above, to establish a constitutional invasion of privacy claim in California, the LAPPL would need to show that its members have a legally protected privacy interest in the financial information required for disclosure. Hill, 7 Cal. 4th at 35-37. Under Moskowitz v. Superior Court, 137 Cal. App. 3d. 313 (1982), there is no question that the LAPPL's members do have such an interest in "personal financial information." 137 Cal. App. 3d at 315-16.

### b. Reasonable Expectation of Privacy

Of course, establishing a privacy interest is but one of the three factors governing a constitutional privacy claim. In addition to establishing its members' legally protected privacy interest, the LAPPL must also establish that they have a

---

[3]The Court previously considered Hansen's remark that it was not clear whether a challenger to an allegedly privacy-invasive policy would "always" prevail where it adduced "proof that...alternative means [for attaining the government's asserted interests] were available," 920 F. Supp. at 1507. The Court found this remark "something of an understatement," because Hill carefully delineated that no one fact is dispositive in the privacy claim analysis. (8/21/08 Order at 14.)

15

reasonable expectation of privacy in the information subject to disclosure. The Court previously considered this issue at the preliminary injunction stage of the proceedings, and the new evidence adduced by the LAPPL does not persuade the Court that the officers have reasonable expectations of privacy in the disclosed financial information.

In its prior consideration of this issue, the Court noted the financial disclosures required of all applicants who seek to become LAPD officers. The LAPPL continues to claim that "the Special Order is far more extensive than entry level financial inquiries (i.e. identification of all stocks, bonds, and mutual funds)." (Opp. at 5.) To directly address this renewed claim in detail, the Court will now compare the Personal History Form for Public Safety Officer Applicants (NOL, Ex. 4, at 65) and the financial disclosure form utilized pursuant to the Special Order. (Id. Ex. 1, at 13-15; see also SGI No. 165.)

Part I of the Special Order form requests information regarding the employee's properties, bank accounts, stocks, bonds, and mutual funds; the Personal History Form requests bank account information, real estate information, stocks and bonds, and "other assets," which would of course include mutual funds. (NOL, Ex. 4, at 65; Id., Ex. 1, at 14.) Part II of the Special Order form requests information about mortgages and unsecured debts; likewise, the Personal History Form requests real estate indebtedness, car payments, house payments, credit cards, "other liabilities," and asks for information about all "long term liabilities." (Id., Ex. 4, at 65; Id., Ex. 1, at 15.) Part III of the Special Order form requests "Outside Income" from "organization[s] other than LAPD"; likewise, the Personal History Form requests "Other income (indicate source)." (Id., Ex. 4, at 65; Id., Ex. 1, at 15.) On the face of the disclosure forms themselves, there is simply no significant difference (indeed no difference at all) in scope between the applicant's initial disclosures and the Special Order disclosures subject to suit.

The LAPPL also argues—as it did in the earlier preliminary injunction stage—that there is an "undisputed custom and practice in the LAPD which has not required financial disclosure as a condition for eligibility to a particular assignment."

(Opp. at 5.)  The Court was not persuaded by this particular argument previously, and the LAPPL's decision to make the same argument using declarations from its own board members (See Hernandez Decl. ¶ 13; Weber Decl. ¶ 5.) adds little to the inquiry. Furthermore, even if the Hernandez and Weber declarations are taken at face value, custom and practice evidence is but one factor inhibiting or creating reasonable expectations of privacy, Hill, 7 Cal. 4th at 36; the Court has previously found that "no single factor should be determinative" in a right to privacy claim.  (8/21/08 Order at 14.)

The LAPPL finally argues that as to "entry level applicants," required pre-employment disclosures and waivers for background applications "have never been treated in the LAPD or in the field of law enforcement as all purpose waivers throughout employment." (Opp. at 5.)  The Court treats such information not as a waiver for all time but rather as compelling evidence that bears on the assertion that officers would never expect that they might be asked to disclose detailed financial information to the department.  Moreover, the support for the waiver argument comes from expert Joseph McNamara (who states merely that it is his "professional opinion" that entry-level financial disclosures do not constitute a permanent waiver) and LAPPL board members Hernandez and Weber (who each temper their remarks with the qualifier that "at no time during my employment" in the LAPD has such a practice existed). (See SGI No. 138; Weber Decl. ¶ 6; Hernandez Decl. ¶ 13.)

Based on this record, the Court cannot conclude that the LAPPL can state a privacy claim based on the requirement that specified officers disclose the information required by the Special Order.  Peace officer applicants in the first instance made a conscious choice to disclose their financial holdings in return for the salary, respect, benefits and other advantages inherent to their position of public trust.  There is no reasonable expectation that the department would not later require an updated disclosure of this same information in connection with an assignment to a special unit.  Absent a reasonable expectation of privacy in the information in connection with their member's employment, the LAPPL's privacy claim fails.

### c. Serious Invasion of Privacy

For purposes of further discussion, however, the Court will assume, <u>arguendo</u>, that LAPPL's represented officers could demonstrate a reasonable expectation of privacy in their financial data. The central question in the LAPPL's claim would then become whether or not there is a constitutionally-actionable invasion of privacy here—that is: (1) whether the City has a "competing interest" in acquiring the private information; and (2) whether there are "protective measures, safeguards, and alternatives" to the Special Order, such that the invasion of privacy is not "justified." <u>Hill</u>, 7 Cal. 4th at 38.

### i. Legitimate Competing Government Interests

The Court is not persuaded that there is a genuine issue of fact regarding the government's competing and legitimate interest in this case, <u>Hill</u>, 7 Cal. 4th at 38. As the Court previously remarked, "under the terms of the agreement with the [DOJ], the LAPD must comply with all aspects of the Consent Decree, including Paragraph 132," and the Special Order explicitly aims to satisfy Paragraph 132. (8/21/08 Order at 12-13.) The City has a legitimate interest in complying with the Consent Decree and the more recent Transition Agreement, because it must honor its obligations to the federal government. The LAPPL does not offer any new evidence to challenge this conclusion.

The LAPPL does, however, offer evidence to challenge the <u>second</u> portion of the Court's previous finding regarding the government's competing interest. Where the Court had concluded that "the Special Order furthers the LAPD's permanent, institutional interest in...preventing corruption in special units by requiring 'regular and periodic disclosures by all LAPD officers...who routinely handle valuable contraband or cash," (8/21/08 Order at 13), the LAPPL now offers declarations from experts Gary C. Johnson,[4] a veteran FBI agent and previous expert in forensic accounting and fraud, and

---

[4]Johnson states that "officers completing the financial disclosure report will know that unless the financial information...is available through public source databases...concealed information will likely not be discovered"; that "officers with information to conceal can elect not to complete the financial disclosure

Joseph D. McNamara,[5] a former police chief in Kansas City and San Jose, to the effect that the Special Order disclosures will be ineffective in detecting corruption. Thus, the LAPPL argues that the "impact" on its members' privacy interests cannot be "justified where the [City] cannot establish that the governmental objective of prevention and detection of financial corruption will be facilitated" by the Special Order. (Opp. at 5.) The LAPPL also cites McNamara to the effect that the disclosure policy "will discourage qualified officers from serving in...units due to the burdens respecting such disclosures"; that the policy "is a reflection of outmoded...models of police leadership which have failed to deter...corruption"; and that the "financial disclosure requirement is impractical, unwieldy, and deeply flawed as a management tool." (Opp. at 7.) McNamara states that the "most effective force in preventing police corruption is the value system developed with the rank and file." (See McNamara Decl. ¶ 13.)

The City separately objects to the declarations of McNamara and Johnson, arguing that they are unqualified and stating "how would Johnson and McNamara be qualified to offer expert opinions on the City's financial disclosure policy when neither has experience with the City or [Police] Department...?" (City Obj. Pl. Expert Declarations at 10.) While the Court will not go so far as the City urges and wholly exclude McNamara and Johnson's findings, it is significant to note that McNamara and Johnson offer no methodology to support their conclusions,[6] nor do they indicate a

---

report"; that "informing officers of the scope of the financial disclosure will provide them opportunity to circumvent the undesired disclosure"; that "financial privacy laws make it extremely difficult, if not virtually impossible, to find hidden assets" and that officers could place assets or liabilities in the names of parents, relatives or friends to conceal them. (See Opp. at 6; SGI Nos. 108-113; Johnson Decl. ¶ 8.)

[5] McNamara states that the "vast majority of police drug corruption crimes involve...small amounts of money that would not be reflected in the financial disclosure reports"; that "most drug arrests are not made by specialized investigating units"; that "the guilty officer typically follows a pattern of loosely squandering money on....activities not exposed by the financial disclosure policy"; and that federal law enforcement agents engaging in financial corruption "were not detected through their financial disclosure reports, but rather by means of informants and standard police techniques." (See Opp. at 7; SGI Nos. 124-128; McNamara Decl. ¶¶ 13-14.)

[6] The proponent of expert testimony must establish that the expert's opinion is based on sufficient facts and data, that it is the product of reliable principles and methods, and that those principles and methods

survey or study by which they: (1) analyzed disclosure requirements (or lack thereof) in various law enforcement agencies; (2) explained which of those agencies has resisted corruption; (3) linked the existence or non-existence of corruption to the agency's disclosure requirements; and (4) held other variables constant, such that a factfinder could rationally conclude that disclosure procedures failed to decrease agency corruption. Additionally, McNamara and Johnson are opining on the issue of whether the LAPD's policy will be effective in assessing LAPD-specific corruption, yet they do not have experience with LAPD-specific anti-corruption efforts and needs. Neither expert indicates any work experience in the LAPD itself. Thus, this additional evidence does not alter the Court's conclusion that the Special Order will prevent corruption.

In a last-ditch argument, the LAPPL claims that the Special Order will be ineffective because, on its face, it contains no specific standards for applying satisfactory financial eligibility criteria. (Opp. at 7; SGI No. 153, NOL, Ex. 1 [Special Order].) However, as the Court previously noted at the preliminary injunction phase, the data need not be collected to establish "satisfactory financial eligibility" for a given post, but can also be used to establish "a financial baseline" which is "an essential starting point in an investigation into officers who appear to be living beyond their means." (8/21/08 Order at 21.)

In sum, the LAPPL has not established that the Special Order fails to serve a legitimate government interest. Even if the LAPPL could show that the Special Order would be ineffective in detecting corruption—and the evidence does not support such a conclusion—there is no suggestion that the City lacks a legitimate interest in complying with its previous agreement with the DOJ to seek disclosures. Accordingly, there is no genuine issue of material fact regarding whether the City has a compelling interest in implementing the Special Order and seeking financial disclosures.

---

have been reliably applied to the facts of the case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999).

**ii. Availability of Protective Measures, Safeguards, and Alternatives**

While the City has established a governmental interest in the LAPPL members' financial information, under <u>Hill</u>, the LAPPL may "undertake the burden of demonstrating the availability and use of protective measures, safeguards, and alternatives to defendant's conduct." <u>Hill</u>, 7 Cal. 4th at 38. Thus, "if sensitive information is gathered and feasible safeguards are slipshod or nonexistent, or if defendant's legitimate objectives can be readily accomplished by alternative means having little or no impact on privacy interests, the prospect of actionable invasion of privacy is enhanced," despite the presence of the competing government interest. <u>Id.</u> However, "if the intrusion is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged." <u>Id.</u>

(1) Alternatives

The LAPPL first offers "effective alternatives to" the Special Order, which would have "lesser impact on privacy interests." <u>Id.</u>; <u>see also</u> Opp. at 8.) The City offers as alternatives:

(1) a properly structured and rigorous selection process;

(2) proper internal policies, procedures, and protocols;

(3) continuous supervision of operations, informants, cash, and valuable contraband;

(4) oversight by external law enforcement agencies, including the federal government and media;

(5) anonymous tip programs for officers to report questionable activities;

(6) instilling a culture of integrity in the applicable units;

(7) sting operations;

(8) expanded use of polygraphs in selecting officers for Narcotics units and including financially-related questions;

21

(9) review of TEAMS records for selecting officers; and

(10) use of conflict of interest forms.

(SGI Nos. 114-120; 141; see also Johnson Decl. ¶ 9; McNamara Decl. ¶ 13.)  Such measures would allegedly be "consistent" with the requirements of paragraph 132.

First, the Court notes that many of these elements were incorporated in or contemplated by other provisions of the Consent Decree and, though good practice, do not substitute as an alternative means of achieving the objectives of financial disclosure. For example, the parties proposed a modification of the decree to change Paragraph 132 to provide for a sting audit procedure.  However, such a procedure was already in place under different provisions of the Consent Decree.  This is a tool that the Audit Division can implement if and when it sees fit, but it is not a substitute for disclosure.  Similarly, one would expect that the TEAMS data would be used as part of the selection process; that is why the Court insisted that the TEAMS II components of the decree be fully implemented as a condition to termination of the decree.  Likewise, one would hope that the LAPD's selection process, which properly includes a requirement of financial disclosure, is properly designed and rigorously implemented to hire the best possible police officers.  However, anyone who has been involved in the hiring process knows that it is an art and not a science and that best efforts do not always lead to best results. Finally, the Court understands the importance of promoting a culture of integrity, which the Court views as essential to effective policing and as a fundamental goal of the Consent Decree.  Obviously if the department were completely free of corruption, then the requirement of financial disclosure would be superfluous.  But to assume that any effort to encourage ethical policing would be completely successful would be naive.  In any event, the Consent Decree Monitor noted in connection with several court hearings that financial disclosure of the type required under the decree constitutes a "best practice," and the LAPPL has offered no evidence to contradict that conclusion.

The City also notes that "consistency" with paragraph 132 is not the objective. Compliance...is." (Reply at 10.) Thus, because "Plaintiff's experts do not offer less

intrusive means for obtaining information necessary to comply with the...plain language" of paragraph 132, their alternatives are not relevant. (Id. at 10.) In that regard, the Court has previously concluded that "the LAPD has a legitimate need for information regarding the financial condition of officers in certain units," as required by Paragraph 132. (8/21/08 Order at 15.) Better external oversight, better policies and selection processes, anonymous tip programs, and cultural changes in the LAPD would not be "alternative means" by which the City's financial-information goals can be "readily accomplished." Hill, 7 Cal. 4th at 38.

Some of the suggestions are also completely unrealistic. For example, as to external oversight, it is simply not feasible (nor would it be appropriate) for the U.S. Attorney's Office, a federal prosecutorial agency, to conduct some sort of day-to-day or periodic reviews of departmental operations to insure that the LAPD is corruption free.[7] Nor can the Court imagine the City Council, the Police Commission, or the Chief of Police and his management staff would agree to have any outside agency intrude on their management and oversight responsibilities. The disclosure requirement is designed to allow for effective management and early detection of potential corruption to avoid the involvement of other agencies in the department's operation.

The LAPPL's other proposed "alternatives" include conflict of interest forms, and the Court has already stated that those are not "appropriate." (8/21/08 Order at 15 n.3.) More expansive polygraphs on financial issues, and continuous supervision of cash and valuable contraband would, if anything, be more invasive to the officers' privacy interests than required disclosures, because they would involve either observing officers unawares, or forcing them to reveal financial information in a polygraph setting. Requiring a polygraph on financial issues could not possibly be less invasive to privacy than requiring completion of a disclosure form.

---

[7]The notion that LAPPL seriously proposes or that the department would agree to oversight by "media," or that this would somehow be less intrusive than the financial disclosure requirement, is too far-fetched to warrant comment,

23

In sum, the LAPPL has not "enhanced" the prospects of an actionable invasion of privacy claim by introduction of evidence concerning these supposed alternatives. Hill, 7 Cal. 4th at 38.

### (2) Retention Safeguards

On the issue of inadequate safeguards for retaining confidential financial information, the LAPPL cites Fraternal Order of Police v. City of Philadelphia, 812 F.2d 105 (3d Cir. 1987), to argue that "written, explicit, and binding rules that contain[] adequate safeguards against unnecessary disclosure" are required. The LAPPL then cites Hill to the effect that "feasible safeguards" to disclosure in this case "are slipshod or nonexistent." (Opp. at 8-9.)

The opposition brief states that "employees subject to the financial disclosure process must (1) complete and return the financial disclosure forms...and (2) attend a Consent Decree Bureau appointment to provide supporting documentation...and, if directed by the Department, a self-generated credit report." Then, the LAPPL proceeds to argue that completion of the report "could result in officer identity theft." (Opp. at 9.) However, the Court previously considered this issue and rejected the argument, stating that "the Court has always found the 'identity theft' argument particularly unpersuasive." (8/21/08 Order at 20.) As the Court has previously noted, candidates for a position with the department must provide their driver's license and social security numbers when they apply in addition to their detailed financial data. Nothing more would be required to steal the officer's identity. Moreover, the Court noted that "any officer who uses a credit card to buy lunch at a local restaurant or to make an internet purchase runs the risk that the merchant may either intentionally or unwittingly provide that data to a thief. The financial disclosure requirement creates little to no increased risk to the affected officers.

Next, the LAPPL states that the Special Order does not prohibit "Consent Decree employees" from making "independent" remarks after reviewing the financial disclosure reports, such as noting "information derived from" the report. (Opp. at 10.)

The LAPPL also complains that the financial disclosure reports will be scanned on a computer disk, but claims there is no protocol for the scanning process. (Opp. at 10.) Finally, the LAPPL argues that the financial disclosure documents are scanned and kept in the Chief of Police's office, where there "remain[] legitimate concerns as to...total security after normal working hours." (See Opp. at 10; SGI No. 156; McNamara Decl. ¶ 16, Ex. 1 at 18.)

In the face of these arguments, the City states (and the Court agrees) that "Plaintiff posits that a triable issue is created by speculation." (Reply at 12.) Indeed, no policy for data-retention could address every single potential security vulnerability, but retaining the scanned confidential information in a central, well-protected area of department headquarters and severely limiting access to the information is a reasonable and prudent security safeguard. As the LAPPL has only raised "metaphysical doubt" regarding whether the retention policies are adequate, it cannot thereby defeat summary judgment. Matsushita, 475 U.S. at 586.

### (3) Access Safeguards

The LAPPL then argues that "triable issues of fact" exist as to whether "access" to the officers' confidential information is inadequately safeguarded (Opp. at 10.) First, it is alleged that while "the...Consent Decree Bureau employees, Captain of Civil Rights Integrity, Commanding Office of the Consent Decree Bureau, and Chief of Police" are the only individuals specified under the Special Order as having access to confidential financial information (NOL, Ex. 1), there is no "preclusion against other employees being granted authorization by the Department." (Opp. at 10; Special Order, NOL, Ex. 1.) Second, although the information in the Special Order is subject to "generalized prohibitions in the [Department] Manual against disclosure of departmental information," those prohibitions do not mandate disciplinary or criminal penalties for disclosure." (Opp. at 10.) Third, the LAPPL states that the Manual "permits the release of 'personal information'...by any watch commander or officer in charge" (NOL at Ex. 5., p. 76.) and "permit[s] non-supervisory personnel access to computers containing

confidential information." (Id.) Finally, the Manual procedures would additionally be "subject to at-will revisions and amendments." (Pl. Req. Jud. Not. No. 1.)

The Court previously considered arguments about employee access to the financial disclosures, the lack of explicit anti-disclosure penalties, and Manual protections, and concluded that "absolute certainty" that information could not be stolen or improperly disclosed "is inevitably elusive." (8/21/08 Order at 19.) Instead, the Court stated, "the question is whether the City of Los Angeles has established that reasonable and appropriate safeguards have been established to protect and maintain the confidentiality of the disclosed information....[T]he City has met that standard." (Id.)

In the present case, the Court is mindful of Hill's observation that "if the intrusion" on an individual's privacy interest "is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged." Hill, 7 Cal. 4th at 38. Again, while the LAPPL has raised "some metaphysical doubt" about whether or not the confidential financial information would be subject to limited access, this type of abstract doubt will not defeat summary judgment. Matsushita, 475 U.S. at 586. Indeed, the LAPD has taken steps to "carefully shield" the information from disclosure by limiting access, and the LAPPL has already "completed 30 financial disclosures" without any apparent incident. (Reply at 10 n.6.) LAPPL's speculative parade of horribles is not sufficient to create a genuine issue of material fact for trial.

### (4) Release Safeguards

The LAPPL finally claims that there is a "lack of safeguards" respecting "release of confidential financial information" collected pursuant to the Special Order. In particular, it is asserted that there are "statutory mechanisms for the disclosure of personnel records of peace officers in...state cases...[under] the 'Pitchess' procedure," and once "personal financial information is received and documented by the LAPD, it will become a 'personnel record' and subject to regularly occurring discovery." (Opp. at 11-12.) The argument fails to acknowledge that personnel records are deemed

26

confidential (Penal Code § 832.7) and can only be obtained through procedures established under Evidence Code Sections 1043 and 1046. These procedures require that the materials be sought only through a written motion and that written notice be given to the police agency and the officer whose records are sought. Evid. Code § 1043. The motion must establish good cause and materiality, and then the documents must be reviewed by the trial judge in chambers who then "discloses only that information falling within statutorily defined standards of relevance." Zanone v. City of Whittier, 162 Cal. App. 4th 174, 187 (2008). In short, the Pitchess procedure contains a number of safeguards to ensure that confidential personnel information is not casually disclosed in the course of litigation involving police officers.

Moreover, as the Court previously stated in its preliminary injunction order, "discussion of the Pitchess process implicitly, and erroneously, assumes that officers' financial information would not be discoverable at all but for its disclosure to LAPD....This is not so. In civil and criminal cases, financial information...may be obtained through discovery where relevant and material....[T]here is nothing in the...Special Order that would make an officer's personal financial information more available through discovery than it already is, and nothing in the...Special Order purports to eliminate or minimize the protections available under...Pitchess." (8/21/08 Order at 17-18.) For example, an officer's financial information, including detailed net worth data, may be obtained in civil rights cases where a claim for punitive damages is litigated. Thus, the possibility that the information can be obtained through discovery has little bearing on the privacy issues being litigated in this case.

The LAPPL then argues that the "Department's disqualification of an officer from a special assignment due to his financial condition under the Special Order would also be subject to a finding of impeachment evidence....Such impeachment information respecting the affected officer would be subject to disclosure....and...subject to entry in the Brady Alert System for reference in all future cases involving the officer....[A]ny negative analysis of the officer's Financial Disclosure Report...will adversely affect

criminal prosecutions as well as create an enduring professional stigma." (Opp. at 12.)
First, the Court sees no way that a finding that an officer might be considered at risk
(which is a far cry from a finding that an officer is corrupt) and therefore disqualified
from holding a particular position would constitute <u>Brady</u> material.  That an officer is
perhaps more vulnerable to temptation than another says nothing about the officer's
character – it is the yielding to temptation that might give rise to <u>Brady</u> material.
Moreover, the LAPPL's argument, taken at face value, does not indicate that actual
<u>confidential financial information</u> about an officer would be released; rather, the
hypothetical posed by the LAPPL involves not the release of the data but rather the
release of the negative <u>analysis</u> of the officer's financial condition.  The issue here is not
the analysis bur rather the protection of the data.

For these reasons, the LAPPL has not demonstrated a lack of adequate
safeguards against release of the collected confidential information under the Special
Order.

### d.  Conclusion

Because the LAPPL has not raised a genuine issue of material fact regarding (1)
its members' reasonable expectations of privacy; or (2) whether the "defendant's
legitimate objectives can be readily accomplished by alternative means having little or
no impact on privacy interests," <u>Hill</u>, 7 Cal. 4th at 38, the Court **GRANTS** the City
summary judgment on the constitutional privacy claim.

### 2. GOVERNMENT CODE SECTION 3308 CLAIM

As discussed above, the LAPPL's claims under Government Code section 3308
are governed by the Circuit's "law of the case" established on appeal.  Accordingly, the
Circuit's finding that "the Special Order comes within the purview of the statutory
exceptions" to section 3308 controls this Court's decision. <u>LAPPL</u>, 314 F. App'x at 75.
The Court hereby **GRANTS** the City summary judgment on the section 3308 claim.

### 3. BREACH OF CONTRACT AND IMPAIRMENT OF CONTRACTUAL OBLIGATION

CLAIMS

### a.  Breach of Contract

The LAPPL has also made breach of contract and impairment of contractual obligation claims in this case.  The complaint specifically alleges that in January 2006, the LAPPL and the City reached an agreement "as to a comprehensive policy for the prevention and detection of financial corruption regarding League represented employees which was consistent with the California Constitution and applicable California laws, was acceptable to the DOJ and achieved the underlying objectives of paragraph 132 of the Consent Decree." (Compl. ¶ 11.) The agreement allegedly provided that:

> The LAPD shall execute regular and periodic anti-corruption integrity audit checks, or "sting" operations, on SEU and Narcotic II unit field officers. The LAPD shall expand the existing polygraph examination for selection of officers to the Narcotics unit to include question(s) related to financial issues. The LAPD shall require for selection of officers to the Narcotics Unit and for II paygrade advancements within the Narcotics Unit: (i) review of the applicable TEAMS record, and the TEAMS record upon implementation of TEAMS (ii) to the extent available from the TEAMS review, supervisors and managers to document their consideration of any sustained administrative investigation, adverse judicial finding or discipline against an officer, in each case, for excessive force, false arrest or charge, improper search or seizure, sexual harassment, discrimination, dishonesty, or improper behavior involving narcotics or drugs.

(Compl. ¶ 11.)

The LAPPL contends: (1) that the "City and the League entered into a Memorandum of Understanding covering the period between July 1, 2006 and June 30, 2009...which governed the terms and conditions of employment of League represented employees"; (2) that the MOU by implication included "all existing terms and

29

conditions of employment, including the aforementioned agreement regarding financial disclosure requirements"; and (3) that the MOU "was approved by the City's governing body and became a binding agreement." (Compl.¶¶ 28-29.) From these facts, LAPPL argues that the January 2006 agreement, and specifically the terms detailed above, were "a comprehensive policy for the prevention and detection of financial corruption," and that the enforcement of Special Order No. 20 "contravene[s] the agreement of the parties" and "constitute[s] a breach of contract." (Opp. at 17.)

In its motion, the City argues that the LAPPL and the City <u>never</u> reached a binding agreement regarding a comprehensive anti-corruption policy in January 2006. (Mot. at 17-18.) The City points out that its collective bargaining with the LAPPL is conducted "pursuant to the Meyers-Milias-Brown Act" and applicable regulations of the City Administrative Code, which would require that any alleged January 2006 agreement be <u>signed</u> by the City's chief negotiator, Commander Mark Perez. (Mot. at 17; Declaration of Mark Perez at ¶¶ 1-6; SGI No. 20.)

Under the provisions of the Meyers-Milias-Brown Act ("MMBA"), if "agreement is reached" by the representatives of a public agency and an employee organization after meeting and conferring in good faith, "they shall jointly prepare a written memorandum of understanding, which shall not be binding, and present it to the governing body or its statutory representative for determination." CAL. GOV'T CODE § 3505.1 (emphasis added). In Government Code section 3500, the MMBA further provides that "[n]othing contained herein shall be deemed to supersede the provisions of existing state law and the charters, ordinances, and rules of local public agencies which...provide for other methods of administering employer-employee relations." <u>Id.</u> § 3500. Thus, "section 3500 reserves to local agencies the right to pass ordinances and promulgate regulations consistent with the purposes of the MMBA." <u>Los Angeles County Civil Serv. Comm'n v. Superior Court</u>, 588 P.2d 249, 253 (Cal. 1978).

Consistent with that section, the City of Los Angeles Administrative Code regulates collective bargaining agreements and provides that its "management

representatives" are to "jointly, with representatives of recognized employee organizations, prepare and sign written memorandums of understanding incorporating all matters agreed on through meeting and conferring in good faith." LOS ANGELES ADMIN. CODE § 4.870(b)(3) (emphasis added).  Consistent with the MMBA, the City's representatives must also "present the memorandums of understanding to the determining body or official for determination." Id. §  4.870(b)(4). All memoranda on which "the City Council is the determining body shall become effective when approved by the City Council," and memoranda on which "the head of a department or office" makes determinations "shall become effective when approved by such body or official." Id. § 4.870(c).  In sum, according to City regulations, "effective" collective bargaining agreements to which the City is a party must be in the form of (1) signed memoranda which are (2) "approved" by the City Council or other responsible officials.

The parties do not dispute that Commander Perez was the LAPD's employee relations administrator during early 2006, and that Perez had the authority to enter into contracts with the LAPPL. (SGI No. 20.)  Although the LAPPL sent Commander Perez a proposed agreement containing the anti-corruption policy referenced above (Defendants' Notice of Lodging, Ex. 6; see also SGI No. 21.), it is undisputed that Perez did not sign the proposed agreement. (SGI No. 26.)  Thus, under applicable City regulations, there was no effective agreement between the City and the LAPPL in January 2006.

Nonetheless, contends the LAPPL, even though the agreement was "not signed," it was otherwise "approved by authorized representatives of the LAPD, City, and the League." (Opp. at 17.)  To support this contention, however, the LAPPL does not offer any actual evidence of the City's approval.  Rather, the Court is referred to the declaration of Enrique Hernandez, LAPPL general counsel, who merely states that it was "my understanding that [the January 2006 agreement] was...approved by authorized representatives of the LAPD, City, and League." (Hernandez Decl. ¶ 8 (emphasis added).) Whatever the value of Hernandez's understanding, no final agreement was

31

reached because no written agreement was signed by the City's bargaining agent. Indeed, as late as February 2006, Perez emailed Bob Baker (the Police Commission President) and stated "I am not sure I want to sign anything." (NOL, Ex. 7.)

The LAPPL's fallback argument is that "Defendant...has cited no authority that a verbal agreement between a recognized public employee association and a public agency cannot, as a matter of law, constitute an enforceable agreement." In support, the LAPPL cites to Vernon Firefighters v. City of Vernon, 107 Cal. App. 3d 802 (1980), where the California Court of Appeal held that "an existing and acknowledged practice affecting conditions of employment has the same dignity as an existing agreement" under the MMBA. 107 Cal. App. 3d at 817. But, in the face of regulatory provisions to requiring a signed written agreement between the parties, and the statement of the City's negotiator that he had not decided to sign the document, the LAPPL has failed to identify or present evidence of any "acknowledged" agreement between the City and the LAPPL regarding anti-corruption practices. Absent such evidence, the regulatory requirements of the Los Angeles Administrative Code require a signed writing. Los Angeles Admin. Code § 4.870(c).

The LAPPL finally cites Glendale City Employees Ass'n v. City of Glendale, 15 Cal.3d 328 (1975), to the effect that a "statute which encouraged the negotiations of agreements, yet permitted the parties to retract their concessions and repudiate their promises whenever they chose would impede effective bargaining." 15 Cal. 3d at 336. Again, however, the question is not whether the City retracted or repudiated its promises, but whether it ever made those promises in the first instance. It would seem clear that, under the City's Administrative Code, a promise is not a promise, and cannot be repudiated or retracted, unless and until it is incorporated into a signed writing. In the present case, this process was not satisfied and there is no evidence that Commander Perez signed or approved the January 2006 proposed agreement. Thus, the Court **GRANTS** the City's motion for summary judgment on the LAPPL's breach of contract claim.

### b. *Impairment of Contractual Obligation Claim*

The LAPPL's complaint also states a claim for impairment of contractual obligation pursuant to the California Constitution. (Compl. ¶¶ 31-32.) However, this claim is based on the contention that "the Proposed Special Order would impair the City's contractual obligations toward the League." (Id.) The LAPPL similarly argues that following "collective bargaining negotiations, the parties reached the agreement as to a comprehensive policy for the prevention and detection of financial corruption....the Special Order on financial disclosure was a substantial impairment of the agreement reached between the parties." (Opp. at 18-19.) Because of the conclusion reached above—that there was no effective January 2006 agreement regarding financial disclosure procedures—a constitutional claim based on impairment of such an agreement is moot. Thus, the Court **GRANTS** summary judgment to the City regarding this claim as well.

### 4. CLAIMS FOR VIOLATION OF GOVERNMENT CODE SECTION 3304(B)

Finally, the LAPPL argues that the Special Order violates Government Code 3304(b). Section 3304(b) provides that:

> No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency against any public safety officer who has successfully completed the probationary period that may be required by his or her employing agency without providing the public safety officer with an administrative appeal.

CAL. GOV'T CODE § 3304(b). In James v. City of Coronado, 106 Cal. App. 4th 905, the California Court of Appeal stated that an officer's administrative appellate rights could be triggered when "action is taken which may lead to adverse consequences." 106 Cal. App. at 909.

The LAPPL claims that the Special Order permits the LAPD to "determine[] that an employee's financial condition is not suitable for the special assignment or not suitable for continuance in a special assignment"; additionally, an officer could be

33

"included in the database of TEAMS II" if rejected for a special assignment, which "could lead to adverse/punitive administrative consequences." (Opp. at 19.) Despite these consequences, there is no "specified procedure within the Special Order for the right to an administrative appeal." (Id.)

The City responds that section 3304(b) already applies to the City's conduct, and "the City cannot legislate around it, nor did it." (Mot. at 22.) The City then argues that "the Special Order does not state that an officer would be deprived" of any section 3304(b) rights; instead the Special Order is "silent on the issue...allowing the law to dictate the circumstances when an officer is allowed an administrative appeal" pursuant to section 3304(b). (Id.; see also SGI Nos. 45-46.)

The LAPPL's argument is without merit. The Special Order contains no provision that provides or even suggests that it is intended to eliminate an employee's administrative appeal rights. As the City notes, "Plaintiff has no evidence that the City has denied, or would deny, an officer an administrative appeal if he were subjected to an adverse action" under the Special Order, and the Court concludes that this argument effectively settles the issue. (Reply at 20.) To the extent the City could have argued that it retained some power to prevent an officer's attempt at an administrative appeal if he or she were denied a position, the present briefing operates as a waiver of the City's right to make such an argument. Thus, the Court **GRANTS** summary judgment to the City regarding the section 3304 claim.

//
//
//
//
//
//
//

**IV.**

**CONCLUSION**

Consistent with the reasoning explained above, the Court **GRANTS** summary judgment to the City as to all five of the LAPPL's claims. The City is to prepare and lodge, no later than February 12, 2010, a proposed judgment consistent with this Memorandum and Order.

**IT IS SO ORDERED.**

DATED: February 3, 2010

_____
Judge Gary Allen Feess
United States District Court